UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| NEKA WELLS, as mother and next friend of A.H. and A.H., JR. and TANISHA JOHNSON, as mother and next friend of A.H., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHATTANOOGA, TENNESSEE, et al., <br><br> Defendants. | Civil Case No. 1:09-CV-219 <br><br> Chief Judge Curtis L. Collier |

# **M E M O R A N D U M**

Before the Court are two motions: a motion for summary judgment brought by Defendants Officers Lauren Bacha, Deborah Dennison, Zachary Moody, George Romero, William Salyers, and Bryan Wood (the "Officers"), in their individual capacities (Court File No. 67); and a motion for summary judgment brought by Defendants City of Chattanooga, Chattanooga Police Department, and the same Officers in their official capacities (collectively, the "City") (Court File No. 53). Plaintiffs Neka Wells and Tanisha Johnson ("Plaintiffs")[1] responded (Court File No. 79), and the Officers and the City replied (Court File Nos. 80 & 81). For the following reasons, the Court will **GRANT** the Officers' motion for summary judgment (Court File No. 67), and will **GRANT IN PART** the City's motion for summary judgment (Court File No. 53). Specifically, the Court will **GRANT** summary judgment for the City on Plaintiffs' federal claims, and will **DISMISS WITHOUT PREJUDICE** Plaintiffs' supplemental state law claims against the city.

---

[1] Plaintiffs are the "next friends" of the decedent's minor children. As explained in the Court's earlier Order and Memorandum, the minor children are the true plaintiffs-in-interest. (*See* Court File Nos. 20 & 21.)

I.   **RELEVANT FACTS**[2]

This case arises out of the tragic shooting death of Alonzo Heyward by Chattanooga Police Officers Bacha, Dennison, Moody, Romero, Salyers, and Wood. On July 18, 2009, at 4:15 a.m., Officers Salyers, Wood, and Romero responded to a dispatch regarding a man with a gun standing outside a McDonald's restaurant on Rossville Boulevard in Chattanooga, Tennessee. The three officers arrived at the McDonald's at approximately 4:20 a.m. Upon arriving at the scene, Officer Salyers saw the man, decedent Heyward, standing in front of some bushes. As soon as Heyward saw the police arriving, he picked up a rifle which he had previously thrown in the bushes.[3] Heyward pointed the rifle at his chin and had his finger on the trigger. Two civilians were with Heyward: his brother, James Heyward, and a friend, Otis Smart.

When the three officers saw Heyward was armed, they immediately drew their weapons. All three officers ordered Heyward to drop the rifle. Heyward's brother and friend were also yelling at him to put down the gun. Heyward did not put down the gun, but instead left the McDonald's parking lot and began walking up 7th Street, all the while keeping the barrel of the rifle under his chin, with his finger on the trigger. Heyward's brother and friend walked with him, still pleading with him to put the gun down.

The officers walked behind Heyward, all the while telling him to drop the rifle. Heyward continually refused, yelling out that he wanted to die. Several times during the walk, Heyward

---

[2] All facts in this case – except one, which will be noted – are undisputed.

[3] Though the police were unsure of the specific type of gun at the time, in fact it was a .44 caliber rifle.

2

paused, turned towards the officers, and screamed that he wanted to die, and the officers would have to kill him because he was not going to put down the gun. During the walk, Officer Dennison arrived and joined Officers Romero, Salyers, and Wood. She, too, heard Heyward repeatedly telling the police to shoot him.

At 4:23 a.m., a hostage negotiator and SWAT team were requested on radio dispatch. About a minute later, after walking approximately two blocks from the McDonald's, Heyward turned and walked into the yard of a residence – his own, in fact. Several other citizens, mostly family members of Heyward, apparently, were standing outside the house. As Heyward, his brother and his friend, and the four police officers entered the front yard of the residence, Officers Bacha and Moody arrived on the scene. Heyward's brother approached Officer Moody and pleaded with him not to kill Heyward. Heyward's brother told Officer Moody that Heyward had been drinking all day and had been threatening suicide. He then asked Officer Moody to please let the family members continue trying to "talk him down." Officer Moody asked Heyward's brother if the rifle was loaded, and the brother answered yes. Upon learning this, Officer Moody brushed past the brother and joined the other officers.

Heyward continued to disregard the officer's instructions to lay down the rifle in the yard. Instead, he started walking up the porch steps of the residence, towards the front door. The officers did not know who, if anyone, was inside the house. As Heyward reached the top of the steps, Officer Dennison deployed her taser against him.

Only one of the taser's two darts hit Heyward. As a result, he did not receive a full, debilitating electric shock, and did not "lock up" and fall over as expected. Instead, he began turning around to face the officers, who were only a few feet away. Officer Wood yelled "no, no,

3

no, no." (Court File No. 68-5, p. 6). At this point, an issue of fact arises: According to the officers, Heyward removed the rifle barrel from his chin and began lowering it in the direction of the officers. (Court File Nos. 68-5, pp. 5-6, 67-3, pp. 15-16, 68-4, pp. 2-3, 67-4, pp. 10-11, 67-5, pp. 13-14). According to Plaintiffs, Heyward never lowered the rifle barrel from his chin.[4]

While it is disputed whether Heyward began lowering his rifle towards the officers, or merely turned around after being tazed while keeping the rifle barrel steadily under his chin, what happened next is not in dispute: at 4:25 a.m. – five minutes after the officers' initial arrival on the scene – all six officers opened fire upon Heyward.[5] Several rounds struck Heyward as he was standing. Heyward fell backwards, but was still alive and, according to Officer Bacha, asked "why are you shooting me." Heyward still gripped the rifle, and pointed it in the officers' direction – a fact Plaintiffs do not contest. The officers fired again. Heyward remained on his knees, gripping the rifle, and the officers fired a third volley. At this point, Heyward finally fell, facedown, on the porch, with the rifle under him. The gun was loaded with .44 caliber magnum ammunition, the hammer was pulled back, and Heyward's finger was on the trigger.

Collectively, the six officers fired 59 shots at Heyward. Heyward was struck by 28 bullets, with 26 of those bullets entering his body, the others only grazing him. (Court File No. 69-1, p. 52). Of the 26 entrance wounds, 20 were consistent with bullets striking Heyward from the front.[6]

---

[4] Plaintiffs quote deposition testimony from four witnesses, stating Heyward did not lower the rifle. However, Plaintiffs did not submit the actual deposition transcripts to the Court.

[5] According to the officers, at the time they opened fire, Heyward had lowered his rifle from a 90-degree angle (under his chin) to approximately a 45-degree angle.

[6] Four of these 20 wounds were on the back side of Heyward's arm, but the medical examiner testified such wounds are consistent with frontal gunfire if Heyward had been holding an object, like a rifle, in bent arms.

4

Plaintiffs have sued the Officers in their individual capacities, and the City and the Officers in the Officers' official capacities. Count I alleges the Officers, in their individual capacities, violated Plaintiffs' constitutional rights under 42 U.S.C. § 1983 by using excessive force in violation of the Fourth and Fourteenth Amendments. Count II alleges the City knowingly permitted an official pattern or practice of violating citizens' constitutional rights, or failed to adequately train and supervise officers in the use of deadly force. Count III alleges the City is liable for negligent conduct by the Officers, committed in their official capacities, under the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. §§ 29-20-101 *et seq*. ("TGTLA").

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d

1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. ANALYSIS

### A. § 1983 Individual Capacity Claims Against Officers

Plaintiffs' only claim against the Officers in their individual capacities is a § 1983 excessive force claim, found in Count I of the Complaint.[7] The Officers assert qualified immunity as a complete defense.

#### 1. Qualified Immunity Framework

The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability, as long as their actions reasonably could have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Even if a government official deprives a plaintiff of a federal right, "qualified immunity will apply if an objective reasonable officer would not have understood, by referencing clearly established law, that his conduct was unlawful." *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir.

---

[7]Specifically, the Complaint alleges deprivation of Plaintiffs' constitutional rights of: 1) Freedom from unreasonable seizure; 2) Freedom from the use of deadly, unreasonable, unjustified, and excessive force; 3) Freedom from deprivation of liberty without due process; and 4) Freedom from summary punishment. These claims, collectively, are properly characterized as an "excessive force claim."

6

1999). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The plaintiff bears the burden of showing a defendant is not entitled to qualified immunity. *See Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

To determine if qualified immunity applies, courts employ a two-part test. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, if a Constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville and Davidson Cnty.*, 486 F.3d 217, 219 (6th Cir. 2007) (citation omitted); *see also Saucier*, 533 U.S. at 201. This second inquiry looks closely at the particular context of the case, rather than asking whether a right was clearly established "as a broad general proposition." *Saucier*, 533 U.S. at 201. If a plaintiff fails to establish either of these prongs, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

Because qualified immunity shields reasonable conduct, even when it is mistaken, the United States Court of Appeals for the Sixth Circuit has at times added a third line of inquiry to the traditional two-part test: "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Peete*, 486 F.3d at 219; *cf. Everson v. Leis*, 556 F.3d 484, 494 n.4 (6th Cir. 2009) (stating regardless of whether the two-prong or the three-prong test is applied, "the essential

7

factors considered are [] the same").

### 2. Constitutional Violation

Excessive force claims are properly analyzed under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Whether or not a use of force is reasonable requires balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9). A plaintiff bears the burden of proving the force used was unjustified in order to state a constitutional deprivation. *Miller v. Taylor*, 877 F.2d 469, 472 (6th Cir. 1989). The reasonableness of an officer's actions is calculated with "allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain and rapidly evolving- about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The "20/20 vision of hindsight" is not the arbiter of reasonableness. *Id.* at 396. "[T]he use of deadly force is only constitutionally reasonable if 'the officer has probable cause to believe that the suspect poses a serious threat of physical harm, either to the officer or to others.'" *Sample v. Bailey*, 409 F.3d 689, 696-97 (6th Cir. 2005) (quoting *Garner*, 471 U.S. at 11).

The question in this case is whether, under the totality of the circumstances, it was objectively reasonable for the Officers to use deadly force against Heyward. The Court finds it was. Heyward's first action upon seeing the police as they pulled into the McDonald's at 4:20 a.m. was

8

to pick up his recently-discarded gun, that is, to re-arm himself. A reasonable police officer, faced with an individual in a parking lot, arming himself in reaction to spotting the police, would immediately be alerted to a serious risk of physical harm posed by that individual.

The events following the initial encounter served only to amplify the Officers' reasonable grounds for believing Heyward posed a serious physical threat. Rather than responding to the Officers' repeated orders to drop his weapon, Heyward fled from the police. During this time, Heyward kept his finger on the trigger of the rifle. Periodically, the intoxicated Heyward would turn around and tell the officers that they would just have to kill him. An officer hearing this would reasonably perceive an implied threat: "you'll just have to kill me, *or else*!" It would be unconscionably reckless for the Officers to assume that the only object of Heyward's threat was himself; that is, that if they did not "just shoot him," he would, while conscientiously avoiding all harm to others, simply shoot himself. Faced with Heyward's armed retreat from the police, repeated "you'll just have to kill me" statements, and possession of a cocked rifle with which he could have killed an officer or civilian in an instant, no reasonable officer would have concluded Heyward posed a threat only to himself.

Yet whatever reasonable belief of Heyward's dangerousness the Officers may have had during the "flight and pursuit," it was nothing compared to the reasonableness of that belief once Heyward left the street, stepped onto his property, crossed the yard, and proceeded up the porch steps towards the front door. At this point, any reasonable officer would have concluded Heyward intended to enter the house; no reasonable officer would have let him do so. While several civilians were standing outside Heyward's house, police had no way of knowing how many, if any, were inside the home. In order to prevent Heyward from entering the house and potentially harming

9

civilians, firing at the police from cover, or even initiating a hostage situation – all reasonable possibilities in light of Heyward's repeated implied threats, disregard for police authority, intoxicated state, and "locked and loaded" disposition – the Officers were, at that moment if not before, entitled to use deadly force against him. *See Garner*, 471 U.S. at 11 (stating deadly force is authorized when an officer "has probable cause to believe that the suspect poses a serious threat of physical harm, either to the officer or to others.").

That the Officers attempted to forestall the use of deadly force by launching a last-ditch, failed effort to resolve the drama with a non-lethal taser, is of no moment. When the taser proved ineffective, Heyward's threat was no less than before; in fact, as he turned back to face the Officers, gun still in hand, finger still on trigger, the Officers could reasonably conclude now was the moment Heyward would make good on the threats latent in his "you'll just have to shoot me" statements. The question of whether Heyward began lowering his gun towards the officers is likewise immaterial to the question of whether it was reasonable for the officers to use deadly force at this moment. As the Eleventh Circuit has stated, "[a]t least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force." *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997). Here, the Officers' repeated orders to drop the gun had gone unheeded, and Heyward was undisputedly armed, dangerous, and a blink of the eye away from killing himself, an officer, or a civilian. It would have been the height of *foolishness*, not reason, for the Officers to wait until Heyward drew a bead on them before they fired, hopefully being faster on the draw than Heyward, and hopefully hitting him somewhere that would instantly prevent his finger from exerting the minuscule force necessary to pull the trigger. In short, when the Officers opened fire, they had

10

manifest probable cause to believe Heyward posed an immediate serious threat of physical harm to themselves and others. Consequently, their use of lethal force was reasonable, and thus did not violate Heyward's Fourth or Fourteenth Amendment rights.[8]

Because a reasonable fact-finder, viewing the facts in the light most favorable to Plaintiffs, could not find the Officers violated Heyward's constitutional rights through excessive use of force, it is unnecessary to consider whether any alleged violated right was "firmly established;" Plaintiffs fail to carry their burden of showing the Officers are not entitled to qualified immunity. Accordingly, the Officers are entitled to summary judgment on the individual capacity § 1983 claim.

**B. § 1983 Failure-to-Train/Unconstitutional Policies Claims Against City**

In light of the Court's determination the Officers did not violate Heyward's constitutional rights, Plaintiff's § 1983 failure-to-train/unconstitutional policies claims against the City, found in Count II of the Complaint, must fail. "[T]he absence of a constitutional violation compell[s] the grant of summary judgment with respect to . . . failure-to-train claim[s] against [a] City." *Steele v. City of Cleveland*, 375 F. App'x 536, 543 (6th Cir. 2010); *see also Cain v. Irvin*, 286 F. App'x 920, 928 (6th Cir. 2008) ("Without a constitutional violation, plaintiff's concomitant municipal liability claim fails as a matter of law.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986));

---

[8]The number of shots fired by the Officers is inconsequential to this analysis. In finding the Officers were justified in using lethal force, it is axiomatic *all* the Officers were entitled to use lethal force; that is, they were not required to have some split-second conferral amongst themselves to designate one Officer to fire. The six officers collectively fired 59 rounds, or just under 10 rounds per Officer. Of these, 26 entered Heyward's body. While in aggregate this may seem a high number, it represents only a modest 4.33 successful shots per officer. Furthermore, uncontroverted testimony shows Heyward remained alive and did not relinquish his trigger-hold on the rifle – that is, the threat was not "neutralized" – until after the Officers fired the full three "volleys." Hence, the number of shots fired does not impugn the proportionality of the lethal force used. *See Baker v. City of Hamilton*, 471 F.3d 601, 607-08 (6th Cir. 2006) (holding use of force after a suspect has been neutralized is excessive as a matter of law).

11

*Frost v. Hawkins Cnty. Bd. of Educ.*, 851 F.2d 822, 827 (6th Cir. 1988) ("[the] finding that a police officer inflicted no constitutional injury on a plaintiff is conclusive not only as to the officer's liability, but also as to the liability of the city"). Accordingly, the City is entitled to summary judgment on the federal municipal liability claims.

### C. State Law Claims Against City

In Count III, Plaintiffs allege the City is liable for negligent conduct by the Officers, committed in course and scope of their employment, under the TGTLA.[9] As a state law claim brought in a federal-question case, this claim can only be heard by the Court through the exercise of supplemental jurisdiction, pursuant to 28 U.S.C. § 1367. Because the Court concludes the exercise of supplemental jurisdiction is improper here, it will dismiss the state law negligence claims.

The TGTLA waives governmental immunity for certain, specified causes of action, including some negligence claims. *See* Tenn. Code Ann. § 29-20-205. The statute declares actions for negligence against governmental entities are within the "exclusive original jurisdiction" of the circuit courts and must be heard "without the intervention of a jury." Tenn. Code Ann. § 29-20-307. All claims must be brought "in strict compliance with the terms of [the Act]." Tenn. Code Ann. § 29-20-201.

The exercise of federal supplemental jurisdiction is discretionary. District Courts may decline to exercise supplemental jurisdiction over a state law claim if:

---

[9]In Count II, Plaintiffs cursorily and without any specificity assert an "in the alternative" claim of Tennessee constitutional violation against the City. Plaintiffs never address this claim in their briefing. Assuming it is actually a well-pleaded claim, and has not been abandoned, the Court's reasoning regarding the supplemental negligence claim also applies to this claim.

12

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Here, two of the above reasons counsel against the exercise of supplemental jurisdiction. First, the Court has disposed of all claims over which it has original jurisdiction, namely, the § 1983 claims against the Officers in their individual capacities, and the failure to train/unconstitutional policies claims against the City.

Second, Tennessee's strong interest in keeping governmental torts claim "in house," evidenced by the TGTLA's exclusive jurisdiction provision, is a "compelling reason" for declining jurisdiction. Tennessee federal courts commonly dismiss pendant state law claims against governmental entities for just this reason. *See, e.g., Beddingfield v. City of Pulaski*, 666 F. Supp. 1064, 1066-67 (M.D. Tenn. 1987) (dismissing pendant state constitutional claim against governmental entity because of the TGTLA's exclusive jurisdiction provision); *Cross v. City of Chattanooga*, No. 1:04CV108, 2005 WL 2456977, *1 (E.D. Tenn. Oct. 3, 2005) (dismissing without prejudice the plaintiffs' state law claims against the City of Chattanooga "[b]ecause the TGTLA provides that exclusive jurisdiction for claims arising under the Act rest with Tennessee state courts"); *Arbuckle v. City of Chattanooga*, 696 F. Supp. 2d 907, 928 (E.D. Tenn. 2010) (same). Likewise, the Sixth Circuit recognizes "[t]his unequivocal preference of the Tennessee legislature [to retain exclusive jurisdiction] is an exceptional circumstance for declining jurisdiction." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000); *see also Maxwell v. Conn*, No. 89-5060, 1990 WL 2774, *4 (6th Cir. Jan. 18, 1990) (affirming district court's decision not to exercise pendent

13

jurisdiction over TGTLA claims).

Accordingly, because the Court has disposed of all claims over which it has original jurisdiction, and in light of Tennessee's "unequivocal preference" for retaining exclusive jurisdiction over claims brought pursuant to the TGTLA, the Court will dismiss without prejudice all of Plaintiffs' state law claims against the City.

## IV. <u>CONCLUSION</u>

For the reasons stated above, the Court will **GRANT** the Officers motion for summary judgment (Court File No. 67), and **GRANT IN PART** the City's motion for summary judgment (Court File No. 53). The Court will **GRANT** summary judgment for the City on Plaintiffs' federal claims, and will **DISMISS WITHOUT PREJUDICE** Plaintiffs' supplemental state claims against the City.

An Order shall enter.

**/s/**
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**